IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
DANVILLE DIVISION

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF INFORMATION ASSOCIATED WITH FACEBOOK USER ID: 100000707116149 THAT IS STORED AT PREMISES CONTROLLED BY FACEBOOK, INC. | Case No. 4:20MJ00030_____<br><br>**FILED UNDER SEAL** |

## AFFIDAVIT IN SUPPORT OF APPLICATION
## FOR SEARCH WARRANT

I, Richard Wright, being first duly sworn, hereby depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1.      I make this affidavit in support of an application for a search warrant for information associated with a certain Facebook user ID that is stored at premises owned, maintained, controlled, or operated by Facebook Inc. ("Facebook"), a social networking company headquartered in Menlo Park, California.   The information to be searched is described in the following paragraphs and in Attachment A. This affidavit is made in support of an application for a search warrant under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A), and 2703(c)(1)(A) to require Facebook to disclose to the government records and other information in its possession pertaining to the subscriber or customer associated with the user ID, including the content of the subscriber's or customer's account.

2.      I am an "investigative or law enforcement officer" of the United States within the meaning of Title 18, United States Code, Section 2510(7) and am empowered by law to conduct investigations of, and to make arrests for, offenses in violation of Title 18 and Title 21 of the United States Code.

3.      Specifically, I am a Task Force Officer ("TFO") with the Federal Bureau of Investigation ("FBI") and have been so employed since May 15, 2019.  I am currently assigned to

1

the Richmond Division of the FBI, Lynchburg Resident Agency.  In addition to my employment as a FBI TFO, I serve as an Investigator for the Danville Police Department and have been so employed since August 2012.  I am presently and have been previously assigned to investigate a variety of criminal matters, to include violent criminal acts, gangs, and firearm investigations. Further, I have experience and training in a variety of investigative and legal matters, including the topics of lawful arrests, the drafting of search warrant affidavits, and probable cause.  I have participated in numerous criminal investigations focused on firearms, armed drug trafficking violations, and criminal street gangs.  I have investigated violations of Title 18, United States Code, Section 1962 (Racketeering Influenced Corrupt Organizations Act); Title 18, United States Code, Section 1959 (Violent Crimes in Aid of Racketeering); Title 18, United States Code, Sections 922 *et seq.* (Firearms Offenses); Title 18, United States Code, Sections 841 *et seq.* (Drug Offenses); and other federal statutes.

4.      The facts in this affidavit come from my personal observations, my training and experience, as well as information obtained from other law enforcement officers and in interviews with witnesses.  This affidavit is intended to show only that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

5.      Based on the facts set forth in this affidavit, there is probable cause to believe that violations of Title 18, United States Code, Section 1962 (Racketeering); Title 18, United States Code, Section 1959 (Violent Crimes in Aid of Racketeering); and Title 21, United States Code, Section 841 et seq. (Drug Trafficking) have been committed.

## TECHNICAL BACKGROUND ON FACEBOOK

6.      Facebook owns and operates a free-access social networking website of the same name that can be accessed at http://www.facebook.com.  Facebook allows its users to establish

accounts with Facebook, and users can then use their accounts to share written news, photographs, videos, and other information with other Facebook users and sometimes with the general public.

7.      Facebook asks users to provide basic contact and personal identifying information to Facebook during the registration process or later. This information may include the user's full name, birth date, gender, contact e-mail addresses, Facebook passwords, Facebook security questions and answers (for password retrieval), physical address (including city, state, and zip code), telephone numbers, screen names, websites, and other personal identifiers. Facebook also assigns a user identification number to each account.

8.      Facebook users may join one or more groups or networks to connect and interact with other users who are members of the same group or network. Facebook assigns a group identification number to each group. A Facebook user can also connect directly with individual Facebook users by sending each user a "Friend Request." If the recipient of a "Friend Request" accepts the request, then the two users will become "Friends" for purposes of Facebook and can exchange communications or view information about each other. Each Facebook user's account includes a list of that user's "Friends" and a "News Feed," which highlights information about the user's "Friends," such as profile changes, upcoming events, and birthdays.

9.      Facebook users can select different levels of privacy for the communications and information associated with their Facebook accounts. By adjusting these privacy settings, a Facebook user can make information available only to himself or herself, to particular Facebook users, or to anyone with access to the Internet, including people who are not Facebook users. A Facebook user can also create "lists" of Facebook friends to facilitate the application of these privacy settings. Facebook accounts also include other account settings that users can adjust to control, for example, the types of notifications they receive from Facebook.

10.     Facebook users can create profiles that include photographs, lists of personal interests, and other information.   Facebook users can also post "status" updates about their whereabouts and actions, as well as links to videos, photographs, articles, and other items available elsewhere on the Internet.   Facebook users can also post information about upcoming "events," such as social occasions, by listing the event's time, location, host, and guest list.   In addition, Facebook users can "check in" to particular locations or add their geographic locations to their Facebook posts, thereby revealing their geographic locations at particular dates and times.   A particular user's profile page also includes a "Wall," which is a space where the user and his or her "Friends" can post messages, attachments, and links that will typically be visible to anyone who can view the user's profile.

11.     Facebook allows users to upload photos and videos, which may include any metadata such as location that the user transmitted when s/he uploaded the photo or video.   It also provides users the ability to "tag" (i.e., label) other Facebook users in a photo or video.   When a user is tagged in a photo or video, he or she receives a notification of the tag and a link to see the photo or video.   For Facebook's purposes, the photos and videos associated with a user's account will include all photos and videos uploaded by that user that have not been deleted, as well as all photos and videos uploaded by any user that have that user tagged in them.

12.     Facebook users can exchange private messages on Facebook with other users. These messages, which are similar to e-mail messages, are sent to the recipient's "Inbox" on Facebook, which also stores copies of messages sent by the recipient, as well as other information. Facebook users can also post comments on the Facebook profiles of other users or on their own profiles; such comments are typically associated with a specific posting or item on the profile.   In addition, Facebook has a Chat feature that allows users to send and receive instant messages

through Facebook.  These chat communications are stored in the chat history for the account. Facebook also has a Video Calling feature, and although Facebook does not record the calls themselves, it does keep records of the date of each call.

13.     If a Facebook user does not want to interact with another user on Facebook, the first user can "block" the second user from seeing his or her account.

14.     Facebook has a "like" feature that allows users to give positive feedback or connect to particular pages.  Facebook users can "like" Facebook posts or updates, as well as webpages or content on third-party (*i.e.*, non-Facebook) websites.  Facebook users can also become "fans" of particular Facebook pages.

15.     Facebook has a search function that enables its users to search Facebook for keywords, usernames, or pages, among other things.

16.     Each Facebook account has an activity log, which is a list of the user's posts and other Facebook activities from the inception of the account to the present.  The activity log includes stories and photos that the user has been tagged in, as well as connections made through the account, such as "liking" a Facebook page or adding someone as a friend.  The activity log is visible to the user but cannot be viewed by people who visit the user's Facebook page.

17.     Facebook Notes is a blogging feature available to Facebook users, and it enables users to write and post notes or personal web logs ("blogs"), or to import their blogs from other services, such as Xanga, LiveJournal, and Blogger.

18.     The Facebook Gifts feature allows users to send virtual "gifts" to their friends that appear as icons on the recipient's profile page.  Gifts cost money to purchase, and a personalized message can be attached to each gift.  Facebook users can also send each other "pokes," which are free and simply result in a notification to the recipient that he or she has been "poked" by the

sender.

19.     Facebook also has a Marketplace feature, which allows users to post free classified ads.  Users can post items for sale, housing,  jobs, and other items  on the Marketplace.

20.     In addition  to the applications  described above, Facebook also provides  its users with  access to thousands  of other applications  ("apps")  on the Facebook  platform.   When a Facebook user accesses or uses one of these applications,  an update about that the user's access or use of that application  may appear on the user's profile  page.

21.     Facebook uses the term "Neoprint"  to describe  an expanded  view  of a given  user profile.  The "Neoprint"  for a given  user can include  the following  information  from the user's profile:   profile  contact information;  News Feed information;  status updates;  links  to videos, photographs,  articles,  and other items; Notes; Wall postings;  friend lists, including  the friends' Facebook  user identification   numbers;  groups  and networks  of which  the user is a member, including  the groups' Facebook group  identification   numbers;  future and past event postings; rejected "Friend" requests; comments; gifts; pokes; tags; and information  about the user's access and use of Facebook applications.

22.     Facebook also retains Internet Protocol ("IP") logs for a given user ID or IP address. These logs  may contain  information  about the actions taken by the user ID or IP address on Facebook, including  information  about the type of action, the date and time of the action, and the user ID and IP address associated with the action.  For example, if a user views a Facebook profile, that user's IP log would  reflect the fact that the user viewed the profile, and would  show when and from what IP address the user did so.

23.     Social networking  providers  like Facebook typically  retain additional  information about their users' accounts, such as information  about the length  of service (including  start date),

the types of service utilized, and the means and source of any payments associated with the service (including any credit card or bank account number). In some cases, Facebook users may communicate directly with Facebook about issues relating to their accounts, such as technical problems, billing inquiries, or complaints from other users. Social networking providers like Facebook typically retain records about such communications, including records of contacts between the user and the provider's support services, as well as records of any actions taken by the provider or user as a result of the communications.

24.     As explained herein, information stored in connection with a Facebook account may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element of an offense (such as an enterprise) or, alternatively, to exclude the innocent from further suspicion. In my training and experience, a Facebook user's "Neoprint," IP log, stored electronic communications, photographs, and other data retained by Facebook can indicate who has used or controlled the Facebook account. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, profile contact information, private messaging logs, status updates, and tagged photos (and the data associated with the foregoing, such as date and time) may be evidence of who used or controlled the Facebook account at a relevant time. Further, Facebook account activity can show how and when the account was accessed or used. For example, as described herein, Facebook logs the Internet Protocol (IP) addresses from which users access their accounts along with the time and date. By determining the physical location associated with the logged IP addresses, investigators can understand the chronological and geographic context of the account access and use relating to the crime under investigation. Such information allows investigators to understand the geographic

and chronological context of Facebook access, use, and events relating to the crime under investigation. Additionally, Facebook builds geo-location into some of its services. Geo-location allows, for example, users to "tag" their location in posts and Facebook "Friends" to locate each other. This geographic and timeline information may tend to either inculpate or exculpate the Facebook account owner. Last, Facebook account activity may provide relevant insight into the Facebook account owner's state of mind as it relates to the offense under investigation. For example, information on the Facebook account may indicate the owner's motive and intent to commit a crime (e.g., information indicating a plan to commit a crime), or consciousness of guilt (e.g., deleting account information in an effort to conceal evidence from law enforcement).

25. Therefore, the computers of Facebook are likely to contain all the material described above, including stored electronic communications and information concerning subscribers and their use of Facebook, such as account access information, transaction information, and other account information.

## THE BLOODS OF DANVILLE

26. Starting in 2017, the FBI, along with other federal agencies, the Danville Police Department ("DPD"), and the Pittsylvania County Sheriff's Office have been investigating gang-related violent crime and homicides in the Danville, Virginia area. During the course of this investigation, we have learned that multiple street gangs operate or have operated in the Danville area in the last few years. These gangs include but are not limited to the Nine Trey Gangsters ("NTG") also known as "9-Trey" or "9-3"; "Norfside;" two sets of the "Millas"; the "Billys" and others. These smaller street gangs are referred to as "sets," but are all affiliated with some form of the Bloods, which is a nationally known gang founded in Los Angeles in the 1970s as a response to the rise and dominance of the Crips street gang. The names of the sets have changed over time

as the sets have evolved in Danville.

27.     It is believed that members of these Danville Bloods sets are closely associated, overlap, and act similarly, and thus this affidavit will hereinafter refer to them collectively as "BLOODS."

28.     The BLOODS and their members are believed to have committed and continue to commit violations of federal criminal statutes, including but not limited to the following:

a.  Title 18, United States Code, Section 1962 (Racketeering);

b.  Title 18, United States Code, Section 1959 (Violent Crimes in Aid of Racketeering);

c.  Title 18, United States Code, Section 1951 (Hobbs Act Robbery); and

d.  Title 21, United States Code, Section 841 *et seq.* (Drug Trafficking).

29.     During the course of this investigation, the FBI has gathered evidence regarding the nature, scope, structure, and activities of the BLOODS. The sources of evidence include the following:

a.  Review of various Facebook accounts maintained by gang members and associates obtained pursuant to federal search warrants, as well as other social media accounts obtained through state search warrants;

b.  Review of historical criminal activity of gang members and associates, such as police reports and court records;

c.  Jail calls between gang members and associates;

d.  Evidence obtained from federal cellphone search warrants; and

e.  Interviews with current gang members and associates.

30.     The BLOODS are a violent criminal street gang operating in the Danville, Virginia area in the Western District of Virginia.  To date, the investigation into the BLOODS has revealed the following information:

a.  The BLOODS are among one of the most violent criminal organizations currently operating in the Danville area.  According to investigations by law enforcement, the BLOODS have committed various violent crimes and been convicted of those crimes, including the murder of Christopher Motley on August 20, 2016; the attempted murder of the "Philly Boys" on June 15, 2016; the armed robbery of the Joy Food Store convenience mart on April 29, 2016; an armed robbery of an individual on December 22, 2016; multiple aggravated assaults and "drive-by" shootings; and the distribution of controlled substances.

b.  Based on previous interviews with BLOODS members we know that in addition to their violent criminal activity, the BLOODS derive income from drug distribution, as well as he sales of firearms and stolen property.

c.  The BLOODS operate within a defined geographic territory within Danville.  It is believed that BLOODS are trying to maintain control over their territory.

d.  Members are initiated through "beat ins" that typically last a predetermined amount of time and consist of beating by multiple gang members.  A member can also be "blessed in" by doing a predetermined crime or list of crimes, such as a murder or a series of robberies.

e.  As is typical with street gangs, the BLOODS commonly utilize a variety of unifying marks, manners, and identifiers, including "gang signs," which refer to hand gestures and tattoos that are specific to the gang organization.  These

insignia can include the 5-point star, which shows a relation to the People Nation (a well-documented organization consisting of a combination of street gangs including Bloods). The BLOODS often identify themselves by using one hand to form a "b," this is believed to show they are members of a Bloods gang. BLOODS also identifies themselves with the color red, as is typical with Bloods gangs nationally.

f.  The BLOODS operate under a specific hierarchy and leadership structure. Generally, members are ranked based on seniority within the gang, amount of individual criminal activity, and other contributions to the gang. Members advance within the leadership structure. Different "positions" within the gang have different names, such as "one-star," "General," and "High," which indicate the level that person holds within the gang structure. Each set has an identified leader at the top of the hierarchy.

g.  The BLOODS function according to a set of rules contained in "books of knowledge." The books of knowledge describe such things as the leadership structure, codes, oaths, regulations, and expectations of gang members.

h.  BLOODS frequently possess firearms, including handguns and semi-automatic rifles. As is typical with street gangs, BLOODS show themselves brandishing these weapons in publicly available videos and in photographs on social media, such as Facebook, in order to promote the gang's violent and intimidating image. BLOODS also use social media as a recruitment tool.

31.  Because of their gang association and participation in various violent crimes, BLOODS members and their associates are currently under investigation, and there is reasonable

suspicion to believe the requested materials will be relevant and material to the ongoing criminal investigation of the gang itself and of the aforementioned offenses.

## **PROBABLE CAUSE**

32.     During the course of this investigation, we have learned and seen that BLOODS and their associates regularly use Facebook as a means of recruitment, to take credit for violent incidents, to communicate with one another about their criminal behavior, to promote the image of the gang, and to schedule gang meetings.

33.     For example, BLOODS members have stated in previous interviews that they use the Facebook Messenger portion of Facebook to communicate directly with other gang members to coordinate criminal activity, share information about a crime in progress, and provide surveillance or other intelligence to members in advance of a criminal act. This is corroborated by Facebook Messenger messages viewed by law enforcement when reviewing previous Facebook search warrant returns of known BLOODS members.

34.     Based on my training and experience, and that of other law enforcement officers with training and experience in the investigation of violent gangs, your affiant knows that even with a lengthy passage of time or deletion of information from the publicly accessible website by the user, Facebook stores the account holder's communications, including but not limited to, private messages, status updates, links to videos, photographs, notes, wall postings, friend lists, subscriber's full name, birth date, address, telephone numbers, contact e-mail addresses, screen names/profiles, account/user identification numbers, duration of account, and other personal identifiers going back multiple years. This nonpublic information stored by Facebook relating to the below Facebook account is likely to be of significant evidentiary value.

35.    During this investigation, the FBI became aware of Kaseem Elijel FORD, also known by the street name "Phat Pockets." It was determined through multiple interviews with confidential sources and active members of the BLOODS that FORD is a high ranking BLOODS leader and that he was responsible for providing members with firearms. Information posted on social media accounts corroborates this information.

36.    In addition, FORD is responsible for trafficking narcotics into the Danville, Virginia area specifically for members of the BLOODS.

37.    Multiple search warrants have been obtained for the Facebook accounts operated by multiple members of the Danville area BLOODS, one of these being the Facebook account operated by Darious Cardwell.

a. During the review of Cardwell's account it was observed that Cardwell answered to FORD and communicated with **FORD's Facebook account "Richie Chapo" User ID: 100000707116149**. (Gang member frequently use aliases for the names of the Facebook accounts in order to avoid detection by law enforcement.)

b. On multiple occasions Cardwell would discuss "Pockets" holding BLOOD meetings and approving new members that were being recruited.

c. Cardwell also referenced "Pockets" showing him how to distribute narcotics to make money for the BLOODS.

38.    Based on the multiple interviews with active BLOOD members and the aforementioned visible activity on **FORD's Facebook account "Richie Chapo" User ID: 100000707116149**, law enforcement began investigating the account. It was determined that the

account had content that was publicly viewable.  In particular,  the account contained the following
public content:

    a.  A photograph  was observed with a timestamp of December 12, 2016, depicting
a black hoodie  with the letters "BBA" inscribed  in red. Information  gathered
from  previous  interviews  with  BLOODS  members  that  "BBA"  is  a  well-
documented  moniker  for "Billy  Bad Ass," a subset of the BLOODS.

    b.  A photograph  was observed with the timestamp of January 8, 2018, that showed
a necklace  with  the  following  inscription:  "QMG  Quick  Money  Gang."  Law
enforcement has learned from previous interviews  with BLOODS members that
"QMG Quick Money Gang" is a common moniker  for a subset of the BLOODS.

    c.  The below photograph  was observed with the timestamp of January 28, 2018,
that revealed multiple  known and documented  members  of the BLOODS to
include  FORD and Darious  Cardwell.  In the photograph  the individuals  are
displaying  several known and documented  hand signs used by gang members
to show their allegiance  with the BLOODS.



d. The below photograph with the timestamp January 13, depicts a white colored NBA jersey with "Phat Poppi" and "31" embroidered in the color red. Additionally, two pieces of jewelry was observed laying on top of the jersey, one with the inscription of "QMG Phat Pockets" and the other with "QMG Zone 6 God Phat Pockets." The following caption was posted with the photograph, "Need I say more OR DO U KNOW YO History imam drop a 100 every game." Law enforcement has learned from previous interviews with BLOODS members that "QMG" is a known moniker for a subset of the BLOODS. Additionally, "Zone 6 God" was known to be a reference to the "600" neighborhood that is a known BLOODS neighborhood in Danville, Virginia. Law enforcement has also learned from obtaining and reviewing multiple BLOODS books of knowledge that the number "31" is frequently used by BLOODS referencing the 31 rules that members of the BLOODS must follow.



e.  All of the aforementioned activity on the accounts took place starting on
    January 12, 2016, and continued through July 1, 2020.

39.     Through my training and experience in investigating gangs, your affiant is aware
of the following:

a.  Gang members and associates commonly use Facebook to plan, coordinate, and
    conduct criminal activity.

b.  Gang members also use Facebook to store and share media, such as videos or
    digital photos, showing gang activity, flashing large sums of money, or carrying
    firearms.  When shared, this media helps to promote the gang and recruit
    additional members.

40.     Therefore, your affiant believes that contents of the account being operated by
FORD may contain enterprise evidence indicating the composition and activities of the BLOODS
gang. It is respectfully submitted that probable cause exists that the data maintained and stored at
the premises of Facebook associated with the Facebook user ID 100000707116149, will lead to

evidence, fruits, or instrumentalities of the crime and could assist in identifying additional witnesses and suspects involved with the enterprise.

## CONCLUSION

41.     Based on the foregoing information, your affiant submits that probable cause exists that the individual listed above has been engaging in activity that violates Title 18, United States Code, Section 1962; Title 18, United States Code, Section 1959; and Title 21, United States Code, Section 841. I believe that the Facebook records being sought for the listed individual contain evidence of the criminal enterprise, as well as direct evidence of various federal crimes.

42.     Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not required for the service or execution of this warrant. The government will execute this warrant by serving it on Facebook. Because the warrant will be served on Facebook, which will then compile the requested records at a time convenient to it, reasonable cause exists to permit the execution of the requested warrant at any time in the day or night.

## REQUEST FOR SEALING

43.     I further request that the Court order that all papers in support of this application, including the affidavit and search warrant, be sealed until further order of the Court. These documents discuss an ongoing criminal investigation that is neither public nor known to all of the targets of the investigation. Accordingly, there is good cause to seal these documents because their premature disclosure may give targets an opportunity to flee/continue flight from prosecution, destroy or tamper with evidence, change patterns of behavior, notify confederates, or otherwise seriously jeopardize the investigation.

## OATH

The information in this affidavit is true to the best of my knowledge and belief.

Respectfully submitted,

s/Richard Wright
TFO, FBI

Received by reliable electronic means and sworn and attested to by telephone

on this  10th  day of July 2020.

*Robert S. Ballou*
ROBERT S. BALLOU
UNITED STATES MAGISTRATE JUDGE

18

## ATTACHMENT A

### Property to Be Searched

This warrant applies to information associated with Facebook user ID: 100000707116149 that is stored at premises owned, maintained, controlled, or operated by Facebook Inc., a company headquartered in Menlo Park, California. Information associated with this account was previously preserved pursuant to 18 U.S.C. § 2703(f).

## ATTACHMENT B

### Particular Things to be Seized

**I.    Information to be disclosed by Facebook**

To the extent that the information described in Attachment A is within the possession, custody, or control of Facebook Inc. ("Facebook"), including any messages, e-mails, records, files, logs, or information that have been deleted but are still available to Facebook, or have been preserved pursuant to a request made under 18 U.S.C. § 2703(f), Facebook is required to disclose the following information to the government for each user ID listed in Attachment A:

(a)    All contact and personal identifying information, including: full name, user identification number, birth date, gender, contact e-mail addresses, Facebook passwords, Facebook security questions and answers, physical address (including city, state, and zip code), telephone numbers, screen names, websites, and other personal identifiers.  If any of the aforementioned Facebook pages are group accounts, all of the following information is requested**:** group identification number, a list of users currently registered to the group, and Group Contact Info, including all contact information for the creator and/or administrator/s of the group and a PDF of the current status of the group profile page.

(b)    All activity logs for the account and all other documents showing the user's posts and other Facebook activities;

(c)    All photos and videos uploaded by that user ID or Facebook accounts associated with the email addresses of the administrators, and all photos and videos uploaded by any user that have that user tagged in them together with any and all photos

identified by Facebook using Facebook's facial-recognition software to match the images uploaded by the user IDs;

(d)    All profile information; News Feed information; status updates; links to videos, photographs, articles, and other items; Notes; Wall postings; friend lists, including the friends' Facebook user identification numbers; groups and networks of which the user is a member, including the groups' Facebook group identification numbers; future and past event postings; rejected "Friend" requests; comments; gifts; pokes; tags; and information about the user's access and use of Facebook applications;

(e)    All other records of communications and messages made or received by the user, including all private messages, chat history, video calling history, and pending "Friend" requests;

(f)    All "check ins" and other location information;

(g)    All IP logs, including all records of the IP addresses that logged into the account;

(h)    All records of the account's usage of the "Like" feature, including all Facebook posts and all non-Facebook webpages and content that the user has "liked";

(i)    All information about the Facebook pages that the account is or was a "fan" of;

(j)    All past and present lists of friends created by the account;

(k)    All records of Facebook searches performed by the account;

(l)    All information about the user's access and use of Facebook Marketplace;

(m)    The types of service utilized by the user;

(n)     The length of service (including start date) and the means and source of any payments associated with the service (including any credit card or bank account number);

(o)     All privacy settings and other account settings, including privacy settings for individual Facebook posts and activities, and all records showing which Facebook users have been blocked by the account; and

(p)     All records pertaining to communications between Facebook and any person regarding the user or the user's Facebook account, including contacts with support services and records of actions taken.

## II.     Information to be seized by the government

All information described above in Section I that constitutes fruits, evidence and instrumentalities of violations of Title 18, United States Code, Section 1962 (Racketeering Influenced Corrupt Organizations Act), Title 18, United States Code, Section 1959 (Violent Crimes in Aid of Racketeering), and Title 21, United States Code, Section 841 et seq. (Drug Trafficking) involving the account identified in Attachment A, including information pertaining to the following matters:

a.     Evidence relating to the structure, membership, scope, and operations of the BLOODS criminal enterprise or the structure, membership, scope, and operations of a rival or competing gang;

b.     Evidence relating to the membership, association or affiliation with a RICO or VICAR enterprise including any and all criminal activity associated with such enterprise;

c.  Communications regarding threats, intimidation, tampering and violence with/against current and former members and associates of the BLOODS or current and former members and associates of rival or competing gangs;

d.  Communications regarding threats, intimidation, tampering and violence with/against witnesses, and law enforcement, including any attempts to impede or obstruct justice;

e.  Evidence indicating how and when the Facebook account was accessed or used, to determine the chronological and geographic context of account access, use, and events relating to the crimes under investigation and to the Facebook account owner;

f.  Evidence indicating the Facebook account owner's state of mind as it relates to the crimes under investigation;

g.  The identity of the person(s) who created or used the user ID, including records that help reveal the whereabouts of such person(s);

h.  The identity of the person(s) who communicated with the user ID about matters relating to violations of Title 18, United States Code, Section 1962 (Racketeering Influenced Corrupt Organizations Act), Title 18, United States Code, Section 1959 (Violent Crimes in Aid of Racketeering), and Title 21, United States Code, Section 841 et seq. (Drug Trafficking) including records that help reveal their whereabouts.